# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **FEDERAL INSURANCE COMPANY, an Indiana Corporation,** )<br><br>               **Plaintiff,** )<br>   **v.** )<br><br>**CONTINENTAL CASUALTY COMPANY,** )<br><br>          **Intervenor Plaintiff,** )<br><br>   **v.** )<br><br>**DANIEL A. D'ANIELLO, ANTHONY J. DeLUCA, PHILIP B. DOLAN, E. MARTIN GIBSON, FRANCIS J. HARVEY, JAMES C. MCGILL, RICHARD W. POGUE, ROBERT F. PUGLIESE, CHARLES W. SCHMIDT, HARRY J. SOOSE, and JAMES DAVID WATKINS,** )<br><br>         **Defendants.** ) | **2:05-cv-305** |

## MEMORANDUM OPINION AND ORDER

Before the Court for consideration and disposition are FEDERAL INSURANCE COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT *(Document No. 81)*, MOTION OF DEFENDANT, HARRY S. SOOSE, FOR SUMMARY JUDGMENT *(Document No. 85)*, THE INDIVIDUAL DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST FEDERAL INSURANCE COMPANY AND CONTINENTAL CASUALTY COMPANY *(Document No. 86)*, PLAINTIFF CONTINENTAL CASUALTY COMPANY'S MOTION FOR SUMMARY JUDGMENT *(Document No. 98)*, and DEFENDANT ANTHONY J. DELUCA'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST PLAINTIFFS FEDERAL INSURANCE COMPANY AND CONTINENTAL CASUALTY COMPANY *(Document No. 102)*.  These motions have been extensively briefed and are ripe for resolution.

Background[1]

This declaratory judgment action is pending before the Court pursuant to 28 U.S.C. § 2201.  This action is in regard to Executive Protection Policy No. 8179-64-85 MTO [hereinafter "Federal Policy"], issued by Federal Insurance Company [hereinafter "Federal"] to The IT Group, Inc. [hereinafter "IT Group"].  *Document No. 125 at ¶ 1.*  The Federal Policy includes an executive liability and indemnification coverage section that, subject to the applicable terms, conditions and exclusions, provides coverage for eligible claims that are first made against the directors and/or officers of IT Group during the policy period.  *Id.*  The policy period was from May 15, 2001, through May 15, 2002.  *Id.*  The limit of liability for the policy period is $25,000,000.00.  *Id.*  Continental Casualty Group [hereinafter "Continental"] sold an excess coverage policy to IT Group, which generally provides coverage in conformity with the provisions of the Federal Policy.  *Document No. 88, p. 4, at ¶¶ 17-18.*  All eleven defendants in this action are former directors and/or officers of IT Group.  *Document No. 125 at ¶ 3.*  Defendants Anthony J. DeLuca [hereinafter "DeLuca"] and Harry J. Soose [hereinafter "Soose"] are former officers of IT Group.  *Id. at ¶ 4.*  On May 10, 2002, Soose was appointed as a director of IT Group, filling a vacancy created by the resignation of Richard W. Pogue [hereinafter "Pogue"].  *Id.*  DeLuca also served as a director of IT Group at one time.  *Id.*  Defendants Daniel D'Aniello [hereinafter "D'Aniello"], Philip B. Dolan [hereinafter "Dolan"], E. Martin Gibson [hereinafter "Gibson"], Francis J. Harvey [hereinafter "Harvey"], James C. McGill [hereinafter "McGill"], Robert F. Pugliese [hereinafter "Pugliese"], Charles W. Schmidt [hereinafter "Schmidt"] and James David Watkins [hereinafter "Watkins"] are all former IT Group directors.  *Id. at ¶ 5.*  D'Aniello and Dolan are managing directors of the Carlyle Group, L.L.C. [hereinafter "Carlyle Group"].  *Id. at ¶ 7.*[2]

The defendants in this action, as well as the Carlyle Defendants, are named as defendants[3]

---

[1]Unless otherwise noted, the facts set forth herein are not in dispute.

[2]The Court refers to all of the defendants as the "Defendants," while the term "Individual Defendants" is used when Soose and DeLuca are not included within the broader category.

[3]The Individual Defendants contend that Soose is no longer a defendant in the Trust Action.  *Document No. 125 at ¶ 8.*

2

in a lawsuit captioned *IT Litigation Trust v. D'Aniello, et al.*, Civil Action No. 04-CV-1268 (D.Del.) [hereinafter "Trust Action"], which underlies this dispute over insurance coverage. *Id. at ¶ 8.* On or around January 16, 2002,[4] IT Group filed a voluntary petition for relief in the United States Bankruptcy Court for the District of Delaware. *Id. at ¶ 21.* From that day forward, management acted as a debtor-in-possession. IT Group, as a practical matter, ceased to exist. Over the ensuing two years, management attempted to marshal assets to reduce the amounts owed to creditors. On October 15, 2003, the Official Committee of Unsecured Creditors [hereinafter "OCUC"] sought leave from the Bankruptcy Court to prosecute avoidance actions on behalf of the Debtors and their estates.[5] *Id. at ¶ 24.* Leave was granted on November 6, 2003. *Id.* The OCUC sought to amend the order of the Bankruptcy Court on December 4, 2003, to provide the OCUC with the additional authority to investigate and, if appropriate, prosecute other causes of action of the debtors and their estates, in addition to the avoidance actions. *Id. at ¶ 25.* These additional causes of action included claims against the debtors' current and former officers, directors and accountants, as well as prepetition advisors, agents and other professional persons. *Id.* On January 15, 2004, the OCUC filed another motion, seeking to amend the prior orders for the purpose of granting the OCUC leave, standing and authority to prosecute causes of action of the debtors' and their estates against the debtors' insiders, including the Carlyle Defendants. *Id. at ¶ 26.*

On January 15, 2004, the OCUC filed a complaint in the U.S. District Court for the District of Delaware against the same defendants named in the pending action. *Id. at ¶ 27.* On February 9, 2004, a First Amended Joint Chapter 11 Plan for IT Group and its Affiliated Debtors [hereinafter "Plan"] was filed in the Bankruptcy Court. *Id. at ¶ 28.* Under the terms of the Plan, a Litigation Trust [hereinafter "Trust"] was created, and a Litigation Trustee [hereinafter

---

[4]Although Federal alleges that multiple petitions were filed, the Individual Defendants contend that there is no evidentiary support for such a claim. *Document No. 125 at ¶ 21.* Furthermore, the Individual Defendants point out that Federal's exhibit does not include the date of the filing. *Id.* Nevertheless, they do not argue that the date of the filing was any date other than that alleged by Federal.

[5]The parties dispute the question of whether leave was sought with the consent of IT Group. *Document No. 125 at ¶ 24.*

"Trustee"] was appointed.  *Id. at ¶ 30.*  With the approval of the Bankruptcy Court, the claims against the Defendants were assigned to the Trust.  *Id.*  On or around January 28, 2005, the Trust filed its First Amended Complaint against the Individual Defendants, as well as the Carlyle Defendants, in which the complaint states that "[t]he Trust brings this action in its capacity as the representative of the Debtors and their estates and for the benefit of the estates' creditors."  *Id. at ¶ 47.*  On November 15, 2005, the U.S. District Court for the District of Delaware issued a Memorandum Opinion which granted in part and denied in part the Individual Defendants' Motion to Dismiss.  *Id. at ¶ 49; IT Group, Inc. v. D'Aniello*, 2005 U.S. Dist. LEXIS 27869, 2005 WL 3050611 (D.Del. 2005).  The claims which remain in the Trust Action are for breach of the directors' and the Carlyle Defendants' respective duties of loyalty in approving payments to the Carlyle Defendants, artificially extending the life of IT Group for the purpose of making such payments, and making preferential payments and fraudulent transfers to the Carlyle Defendants and certain directors.  *Document No. 125 at ¶ 50.*

On or around January 28, 2004, Federal received notice of the complaint filed by the OCUC.  *Id. at ¶ 52.*  In a letter dated March 16, 2004, Federal advised the Defendants that Federal reserved its rights under the terms, conditions and exclusions of the Policy with respect to the action instituted by the OCUC.  *Id. at ¶ 53.*  On or around January 31, 2005, Federal received notice of the First Amended Complaint filed by the Trust.  *Id. at ¶ 54.*  Subsequently, on March 7, 2005, Federal commenced this declaratory judgment action.  *Id. at ¶ 55.*

<u>The Underlying Trust Action</u>[6]

IT Group was a Delaware corporation which maintained its principal office in Monroeville, Pennsylvania.  *IT Litigation Trust v. D'Aniello*, 2005 U.S. Dist. LEXIS 27869, at 4-5 (D.Del. 2005).  It provided consulting, engineering, construction, environmental remediation, facilities and waste management services.  *Id.* at 5.  Such services "included the identification of

---

[6]This section of the opinion provides background information regarding the underlying Trust Action.  It is based primarily on the Memorandum Opinion of the U.S. District Court for the District of Delaware in *IT Litigation Trust v. D'Aniello*, 2005 U.S. Dist. LEXIS 27869 (D.Del. 2005).  No findings of fact are included herein, since the issues in the Trust Action itself are not presently before this Court.

contaminants in soil, air, and water, as well as the subsequent design and execution of remedial solutions." *Id.* The Carlyle Group, which is headquartered in Washington, D.C., is a private merchant bank that invested in IT Group. *Id.* In November, 1996, the Carlyle Defendants collectively invested $45 million in IT Group. *Id.* In return for these investments, they received 45,000 shares of 6% Cumulative Convertible Participating Preferred Stock and detachable warrants to purchase 1.25 million shares of IT Group's common stock. *Id.* at 5-6. The Carlyle Defendants also obtained approximately 25% of IT Group's voting power, along with the right to elect a majority of its board of directors. *Id.* at 6. The Trust alleges that the Carlyle Defendants took control of IT Group in November, 1996, and that they exercised such control at all times relevant to the underlying Trust Action. *Id.* at 8.

As of 1998, IT Group had experienced consecutive fiscal years of money loss. *Id.* The Trust alleges that the Carlyle Defendants, who controlled IT Group, implemented a strategy to grow IT Group by acquiring companies that were engaged in similar lines of business. *Id.* Over a three-year period, IT Group acquired at least eleven companies. *Id.* at 9. It is alleged that these acquisitions were funded by debt financing, including approximately $500 million in secured loans and credit facilities and $255 million in subordinated bond debt issued in 1999. *Id.* at 10. Apparently, this financing scheme increased IT Group's interest payments and strained its liquidity. *Id.* In order to address this problem, it is alleged that IT Group obtained a $100 million term loan in March, 2000. *Id.* The Trust alleges that, as of March, 1998, IT Group was either "insolvent or within the vicinity of insolvency." *Id.* at 11. By the end of 2000, it had a tangible net worth of approximately negative $277 million. *Id.* at 10.

The Trust alleges that, in addition to implementation of the failed acquisition strategy, the IT Group directors and officers engaged in additional acts or omissions which deepened IT Group's insolvency and sealed its financial ruin. *Id.* at 11. Because the board was under the control of the Carlyle Defendants, the Trust alleges that these acts or omissions are directly attributable to the Carlyle Defendants. *Id.* at 11-12. The Trust further asserts that the Carlyle Defendants were paid in excess of $850,000 from consulting agreements with IT Group and in excess of $8.9 million in dividends from their preferred stock. *Id.* at 12. It is alleged that these payments were fraudulent and/or unlawful. *Id.* at 12-13.

<u>Discussion</u>

The applicable portion of the Declaratory Judgment Act provides:

> In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.  Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a).  Federal's four count complaint seeks declaratory relief on the following premises: (1) Federal has no duty to indemnify the Defendants because of the Federal Policy's "Insured v. Insured" Exclusion [hereinafter "IVI Exclusion"]; (2) Federal has no duty to indemnify the Defendants with respect to the avoidance and fraudulent conveyance claims because they were not acting in an insured capacity; (3) Federal has no duty to indemnify the Defendants with respect to the avoidance and fraudulent conveyance claims because of the Federal Policy's "Personal Profit" Exclusion; and (4) Federal has no duty to pay the Defendants' defense costs.  Complaint, ¶¶ 43-67.

Federal has moved for partial summary judgment limited to the IVI Exclusion.  *Document No. 81 at ¶ 4.*  Continental, the intervening plaintiff, has likewise moved for partial summary judgment with respect to the IVI Exclusion.  *Document No. 98.*  Continental has also moved for partial summary judgment with respect to the alleged preferential and fraudulent payments received by the Defendants, contending that the return of such payments would not constitute an insurable loss under the Federal Policy.  *Id.*  The Individual Defendants have moved for partial summary judgment on the ground that the IVI Exclusion cannot be construed to preclude coverage for the Trust Action.  *Document No. 86.*  Defendant Soose has moved for partial summary judgment and incorporates the arguments advanced by all co-defendants in this declaratory judgment action.  *Document No. 85.*  Defendant DeLuca has also moved for partial summary judgment on the ground that coverage is not precluded by the IVI Exclusion.[7]

---

[7]As Federal points out, DeLuca's Motion for Partial Summary Judgment could be construed as a request for summary judgment on issues other than the interpretation of the "Insured v. Insured" Exclusion.  *Document No. 114, p. 5.*  Nevertheless, the Court agrees with Federal's contention that DeLuca's perceived attempt to obtain summary judgment on other

*Document No. 102.*

<u>Standard of Review</u>

Rule 56(c) of the Federal Rules of Civil Procedure reads, in pertinent part, as follows:

[Summary Judgment] shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

In interpreting Rule 56(c), the United States Supreme Court has stated:

The plain language . . . mandates entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be "no genuine issue as to material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

An issue of material fact is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The court must view the facts in a light most favorable to the non-moving party, and the burden of establishing that no genuine issue of material fact exists rests with the movant.  *Celotex*, 477 U.S. at 323.  The "existence of disputed issues of material fact should be ascertained by resolving all inferences, doubts and issues of credibility against the moving party."  *Ely v. Hall's Motor Transit Co.*, 590 F.2d 62, 66 (3d Cir. 1978) (*quoting Smith v. Pittsburgh Gage & Supply Co.*, 464 F.2d 870, 874 (3d Cir. 1972)).  Final credibility determinations on material issues cannot be made in the context of a motion for summary judgment, nor can the district court weigh the evidence.  *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632 (3d Cir. 1993); *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224 (3d Cir.

---

grounds is a drafting error rather than a deliberate attempt to prevail on those grounds at this stage.  DeLuca has not briefed any issues other than the applicability of the IVI Exclusion, so the Court will not address the other issues.  *Document Nos. 103, 119, 120 & 158.*

1993).

When the non-moving party will bear the burden of proof at trial, the moving party's burden can be "discharged by 'showing' -- that is, pointing out to the District Court -- that there is an absence of evidence to support the non-moving party's case." *Celotex*, 477 U.S. at 325.  If the moving party has met this burden, the burden shifts to the non-moving party, who cannot rest on the allegations of the pleadings and must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Petruzzi's IGA Supermarkets*, 998 F.2d at 1230.  When the non-moving party's evidence in opposition to a properly supported motion for summary judgment is "merely colorable" or "not significantly probative," the court may grant summary judgment. *Anderson*, 477 U.S. at 249-50.

Since this Court's jurisdiction is predicated on the diverse citizenship of the parties, the Court must apply the choice of law rules applicable in the Commonwealth of Pennsylvania. *Klaxon v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496-497 (1941).  The parties in this case are in apparent agreement that the substantive law of Pennsylvania governs the interpretation of the Federal Policy.  Therefore, the Court will evaluate the substantive issues in this case in accordance with Pennsylvania law.  *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78-80 (1938).

A.    Applicability of the "Insured v. Insured" Exclusion

The primary issue before the Court is whether coverage under the Federal and Continental Policies is precluded by the IVI Exclusion.  Before addressing this issue on the merits, however, the Court must confront DeLuca's argument that Federal and Continental are estopped from raising the exclusion.  DeLuca contends that Federal is estopped from advancing the coverage issue in this proceeding because it did not raise the IVI Exclusion until March 7, 2005, when it commenced this declaratory judgment action.  *Document No. 103, p. 8.*  This argument is unavailing.

In *Pfeiffer v. Grocers Mutual Insurance Company*, 379 A.2d 118 (Pa.Super. 1977), the Pennsylvania Superior Court explained that, under Pennsylvania law, "the doctrine of waiver or estoppel cannot create an insurance contract where none existed." *Pfeiffer*, 379 A.2d at 121.  In

8

*Wasilko v. Home Mut. Cas. Co.*, 232 A.2d 60 (Pa. 1967), the Supreme Court of Pennsylvania declared:

> The rule is well established that conditions going to the coverage or scope of a policy of insurance, as distinguished from those furnishing a ground of forfeiture, may not be waived by implication from the conduct or action of the insurer.  The doctrine of implied waiver is not available to bring within the coverage of an insurance policy, risks that are expressly excluded therefrom.

*Wasilko*, 232 A.2d at 63.  In order to establish the existence of a waiver, DeLuca must show that the actions of Federal and Continental "constituted a voluntary, intentional relinquishment of a known right," and that Federal and Continental "had full knowledge of all pertinent facts."  *Id.* Such a showing has not been made.  Consequently, the Court concludes that Federal and Continental are not estopped from raising the IVI Exclusion as a defense to coverage in this proceeding.

The Federal Policy, in pertinent part, provides:

> The Company shall pay on behalf of each of the **Insured Persons** all **Loss** for which the **Insured Person** is not indemnified by the **Insured Organization** and which the **Insured Person** becomes legally obligated to pay on account of any **Claim** first made against him, individually or otherwise, during the **Policy Period** or, if exercised, during the Extended Reporting Period, for a **Wrongful Act** committed, attempted, or allegedly committed or attempted by such **Insured Person** before or during the **Policy Period**.
>
> \*\*\*
>
> **Loss** means the total amount which any **Insured Person** becomes legally obligated to pay on account of each **Claim** and for all **Claims** in each **Policy Period** and the Extended Reporting Period, if exercised, made against them for **Wrongful Acts** for which coverage applies, including, but not limited to, damages, judgments, settlements, costs and **Defense Costs**.  **Loss** does not include
>
> \*\*\*
>
> (iii)    matters uninsurable under the law applicable to this coverage[.]
>
> \*\*\*
>
> **Claim** means:
>
> (a)     For purposes of coverage under Insuring Clause[] 1 . . . :

(i)      a written demand for monetary damages or non-monetary relief;

(ii)     a civil proceeding commenced by the service of a complaint or
         similar pleading;

\*\*\*

against any **Insured Person** for a **Wrongful Act** or Interrelated
**Wrongful Act**, including any appeal therefrom . . .

\*\*\*

**Wrongful Act** means:

(a)      For purposes of coverage under Insuring Clause[] 1 . . ., any error,
         misstatement, misleading statement, act, omission, neglect, or breach of
         duty committed, attempted, or allegedly committed or attempted, by any
         **Insured Person** before or during the **Policy Period**, individually or
         otherwise, in his **Insured Capacity**, or any matter claimed against him
         solely by reason of serving in such **Insured Capacity** . . .

\*\*\*

[Insured v. Insured Exclusion]

The Company shall not be liable for **Loss** on account of any **Claim** made against
any **Insured Person**:

\*\*\*

(c)      brought or maintained by or on behalf of any **Insured** except:

(i)      a **Claim** that is a derivative action brought or maintained on behalf
         of an **Insured Organization** by one or more persons who are not
         **Insured Persons** and who bring and maintain the **Claim** without
         the solicitation, assistance or participation of any Insured[.]

*Document No. 125 at ¶¶ 9-14.* The term "**Insured**" includes both **Insured Organizations** and **Insured Persons**. *Id. at ¶ 15.* For the purpose of the pending motions for partial summary judgment, the parties do not dispute that the Defendants are **Insured Persons** under the Federal Policy. *Id. at ¶ 18.* The Federal Policy defines the term "**Insured Organization**" as "those organizations designated in Item 5 of the Declarations for this coverage section." *Id. at ¶ 16.* Item 5 lists "The IT Group, Inc. and Its Subsidiaries." *Id.* The term "**Insured Person**" is defined as "any one or more of those persons designated in Item 6 of the Declarations for this coverage

section." *Id. at ¶ 17.*  Item 6 includes "[a]ny past, present or future director, officer, of the Insured Organization." *Id.*  The Federal Policy also contains Securities Profit, Fraud and Personal Profit Exclusions. *Id. at ¶ 20.*  Although these exclusions are not at issue in the motions currently before the Court, "Federal does not waive or abandon its right to assert these terms, or any other terms, conditions and exclusions in the Federal Policy that may preclude coverage based on facts subsequently uncovered or subsequently developed." *Id.*  Federal also contends that "[c]overage may further be precluded to the extent that the Defendants' actions were not undertaken in their **Insured Capacity**." *Id.*  At the present time, however, only the IVI Exclusion is before the Court.

The issues of contractural construction pending before the Court both deal with the language of the IVI Exclusion.[8]  One such issue is whether the phrase "on behalf of," as it appears in the language of the IVI Exclusion, means "as the representative of" or "for the benefit of."  It is undisputed that the Trust commenced the action "in its capacity *as the representative* of the Debtors and their estates and *for the benefit* of the estates' creditors." *Document No. 1, Ex. E at ¶ 2.*  There is also a question as to whether the term **Insured**, as defined in the Federal Policy, is broad enough to encompass IT Group's post-bankruptcy debtor-in-possession.  Although the debtor-in-possession is clearly not a subsidiary of IT Group, the Court must decide whether the term "IT Group" includes the debtor-in-possession as well as the prepetition entity.

Federal argues that it is entitled to summary judgment on the IVI Exclusion of the Federal Policy for two reasons.  First, Federal maintains that because the Trust was created by IT Group's confirmed bankruptcy reorganization plan, and because the Trust is suing in its capacity as an assignee of IT Group's claims against its directors and officers, the Trust brings the action on behalf of an **Insured** under the Federal Policy. *Document No. 83, p. 2.*  Secondly, Federal contends that even though the Trust purports to be suing for the sole benefit of IT Group's creditors, the derivative exception to the IVI Exclusion is not applicable because the Trust brings the action only with the solicitation, assistance or participation of an **Insured**. *Id.*

The Individual Defendants argue that the IVI Exclusion is not applicable because the

---

[8]Since the Court does not reach the issues regarding the derivative exception to the IVI Exclusion, there are only two issues of interpretation discussed in this opinion.

Trust Action was not "brought or maintained by or on behalf of" any **Insured**.  *Document No. 87, pp. 9-11.*  Furthermore, the Individual Defendants contend that the Trust Action falls within the derivative exception to the IVI Exclusion, and that the Defendants did not solicit, assist or participate in the decision to commence the Trust Action.  *Id., pp. 12-14.*  Because the Court concludes that the IVI Exclusion is not applicable in any event, the Court need not reach the issue of whether the derivative exception is applicable.

In support of their position, the Individual Defendants make three arguments that are relevant for the purpose of the Court's analysis.[9]  First, they argue that the IVI Exclusion does not apply because the claims in the Trust Action are asserted solely on behalf of IT Group's creditors and not on behalf of IT Group itself.  *Document No. 87, p. 5.*  Secondly, they contend that the IVI Exclusion cannot be triggered by the actions of the debtor-in-possession, which is an entity legally distinct from IT Group.  *Id., p. 6.*  Finally, they argue that Federal and Continental cannot demonstrate that the IVI Exclusion, as applied to the specific facts in this case, unambiguously bars coverage.  *Id.*

In an order dated August 25, 2006, this Court stated that it would "take judicial notice of pleadings and orders entered in the IT Group bankruptcy action and the Trust Action that are cited by any of the parties in their respective summary judgment papers, without prejudice to the parties' right to contest the characterization or description of any such document that is offered by any other party."[10]  *Document No. 108.*  On November 6, 2003, the U.S. Bankruptcy Court for the District of Delaware granted the OCUC "leave, standing and authority to prosecute the Debtors' Avoidance Actions on behalf of the Debtors and their estates[.]" *Document No. 84,*

---

[9]The Individual Defendants actually make five specific arguments, but two of them are not relevant to the Court's analysis because of the disposition of the pending motions.  Since the Court concludes that the IVI Exclusion is not applicable to the Trust Action in any event, the Individual Defendants' arguments with respect to the derivative exception and the "reasonable expectations" doctrine need not be addressed.

[10]The plain language of this Court's order of August 25, 2006, permits any party to "contest the characterization or description" of any relevant pleadings and orders.  *Document No. 108.*  For this reason, the Court need not conclude that the phrase "on behalf of," as it is used in the Federal Policy, has the same meaning as that given to it in the orders of the Bankruptcy Court.  This phrase can have very different meanings when it is used in different contexts.

*Attachment 19.* That order was modified by the Bankruptcy Court on December 22, 2003, in an order granting the OCUC "leave, standing and authority to prosecute the Debtors' Other Estate Causes of Action, in addition to the Avoidance Actions, on behalf of the Debtors and their estates[.]" *Id., Attachment 21.* On September 1, 2004, the Bankruptcy Court approved an August 27, 2004 stipulation entered into by the OCUC, "on behalf of the Estate of The IT Group Inc., et al.," and the Individual Defendants. *Id. Attachment 31.* The stipulation acknowledged that, "pursuant to the First Amended Joint Chapter 11 Plan for the IT Group, Inc. and its Affiliated Debtors, confirmed by Order of the Court, dated April 5, 2004 (the "Plan"), the Committee Action and the Debtors Action[11] (collectively, the "Actions") were transferred to the IT Litigation Trust[.]" *Id.* All parties to the OCUC Action consented to the substitution of the Trust as the plaintiff in the OCUC Action, which thereby converted the OCUC Action into the Trust Action. *Id.* Upon the approval of the Bankruptcy Court, this substitution was effected pursuant to Federal Rule of Bankruptcy Procedure 7025 and Federal Rule of Civil Procedure 25. *Id.*

The OCUC filed its complaint against the Defendants on January 15, 2004. The complaint stated as follows: "The Committee brings this action in its capacity as the representative of the Debtors and their estates and for the benefit of the estate's creditors." *Document No. 1, Ex. B, at ¶ 2.* On February 9, 2004, the OCUC and the debtor-in-possession filed a First Amended Joint Chapter 11 Plan, which provided for the creation of the Trust. The Trust was "created on behalf, and for the sole benefit, of the Beneficiaries pursuant to the Plan[.]" *Id., Ex. D.* The term "Beneficiaries" was defined as "the holders of Allowed Lender Claims, Allowed General Unsecured Claims and Allowed Litigation Unsecured Claims under the Plan, or any successors to such holders' Allowed Claims . . ." *Id.* On January 28, 2005, the Trust filed its First Amended Complaint. *Id., Ex. E.* The First Amended Complaint begins with the following words: "Plaintiff, the IT Litigation Trust (the "Trust"), on behalf of the Estate of

---

[11]The language of the stipulation indicates that the phrase "Debtors Action" refers to an adversary proceeding that was commenced against the Carlyle Defendants. *Document No. 84, Attachment 31.* The stipulation indicates that, subject to certain enumerated conditions, the Trust agreed to dismiss the Debtors Action. *Id.*

The IT Group, Inc. . . . ."  *Id.*  The First Amended Complaint also states: "The Trust brings this action in its capacity as the representative of the Debtors and their estates and for the benefit of the estates' creditors."  *Id., at ¶ 2.*  The question before the Court is whether the Trust Action, which is currently proceeding in the U.S. District Court for the District of Delaware, is "brought or maintained by or on behalf of" an **Insured**, which would trigger the application of the IVI Exclusion.

It is apparent that Federal accepted the OCUC Action for coverage.  The Court is aware of a letter dated March 16, 2004, in which Federal accepted the matter for coverage subject to certain enumerated reservations and limitations.  *Document No. 88, Ex. 20.*  Although Federal expressly reserved its right to deny coverage on any ground consistent with the terms, conditions and exclusions of the Federal Policy, it did not mention the IVI Exclusion in the letter.  *Id.*  Accordingly, the Court proceeds on the assumption that the position of Federal and Continental is that the OCUC Action was not within the IVI Exclusion, and that the exclusion was triggered only when the claims were transferred to the Trust.[12]

The Court is also aware of a letter dated April 1, 2005, in which Federal indicated that coverage for the Trust Action was precluded by the IVI Exclusion.  *Document No. 88, Ex. 21.*  This letter postdated the filing of the instant action under the Declaratory Judgment Act.  In the letter, Federal's counsel stated:

> In the First Amended Complaint, the Trust averred that it filed the lawsuit in its capacity as the representative of the estate of IT Group.  As assignee of all of IT Group's claims against its officers and directors, the Trust stands in the shoes of

---

[12]According to the Individual Defendants, Federal and Continental concede that coverage for the OCUC Action was not barred by the IVI Exclusion.  *Document No. 87, p. 5.*  Although the Court can find no explicit concession to this effect in any of the filings of Federal and Continental, the Court is convinced that Federal and Continental have implicitly made this concession.  Their arguments with respect to the derivative exception, which the Court does not reach in this opinion, center on the participation of IT Group in the decision to assign the claims to the Trust.  For this reason, it may be that Federal and Continental considered the OCUC Action to have been "brought or maintained by or on behalf of" an **Insured**, even though it was within the derivative exception.  Although the Court concludes that Federal and Continental have made a concession with respect to the inapplicability of the IVI Exclusion within the context of the OCUC Action, the Court *does not* assume that this is the same as a concession that the OCUC Action was not "brought or maintained by or on behalf of" an **Insured**.

> IT Group.  Moreover, the Trust has brought the claims asserted in the First Amended Complaint against the defendant **Insureds** with the solicitation, assistance and participation of IT Group.  By drafting the Plan which provided for the creation of the Trust and the appointment of the Trustee to sue the defendant **Insureds**, IT Group has solicited the action against the defendant **Insureds**.  By voluntarily assigning these claims to the Trust, IT Group has assisted and participated in bringing these claims.

*Id.*  This language clearly communicated Federal's belief that the assignment of the claims to the Trust triggered the IVI Exclusion, presumably because it took the case outside of the derivative exception to the exclusion.  The last sentence of the quoted passage, however, could be construed as a statement indicating that Federal believed that the claims brought by the Trust were "brought or maintained by or on behalf of" an **Insured**.

Federal buttresses its argument by pointing to the Bankruptcy Court's order dated December 22, 2003, which granted the OCUC "leave, standing and authority to prosecute the Debtors' Other Estate Causes of Action, in addition to the Avoidance Actions, on behalf of the Debtors and their estates . . ."  *Document No. 88, Ex. 18.*  Such language cannot be found, however, in the Bankruptcy Court's order dated September 1, 2004, which provided for the substitution of the Trust as the plaintiff in the action against the Individual Defendants.[13]  *Id., Ex. 22.*  The question presented in this case is whether, for the purpose of the Federal Policy, the Trust Action has been "brought or maintained by or on behalf of" an **Insured**.

It is worth noting that since the Trust is not itself an **Insured**, the Trust Action was not "brought or maintained by" an **Insured**.  Federal and Continental base their argument on the status of the Trust as the assignee of IT Group's claims, and it is undisputed that IT Group was an **Insured**.  The question of whether the Trust Action was commenced "on behalf of" an **Insured** presents a more difficult question.  As noted earlier, the First Amended Complaint indicates that the Trust filed the action "on behalf of The *Estate* of The IT Group," and that the Trust brought the action "in its capacity as the *representative* of the Debtors and their estates and

---

[13]The stipulation, which was approved by the Bankruptcy Court, did contain language indicating that the OCUC was acting "on behalf of the Estate of The IT Group, Inc."  *Document No. 84, Attachment 31.*

*for the benefit of* the estate's creditors." *Document No. 1, Ex. E (emphasis added).* The Trust, however, was "created *on behalf*, and for the sole *benefit*, of the Beneficiaries pursuant to the Plan[.]" *Id., Ex. D (emphasis added).* It is clear that if the phrase "on behalf of" is construed to mean "for the benefit of," coverage for the Trust Action is not precluded by the IVI Exclusion. On the other hand, if the phrase "on behalf of" is construed to mean "as the representative of," coverage for the Trust Action is precluded by the IVI Exclusion. In either case, the IVI Exclusion would not apply, and thus Federal would have to provide coverage for the Trust Action, if the *estate* of IT Group is viewed as a different legal entity from the prepetition IT Group.[14]

Federal argues that the Trust is the assignee of IT Group, and that the Trust does not have "any greater right, power or interest than that possessed by the assignor." *Document No. 83, p. 12.* The Individual Defendants counter by arguing that the debtor-in-possession was not the same entity as the prepetition IT Group, and that coverage for the claims is not precluded by the IVI Exclusion because the entity that assigned the claims was not an **Insured**. *Document No. 87, pp. 15-16.* Federal responds by asserting that the Trust is not a true bankruptcy trustee, but rather "a contractual creation by imaginative attorneys[.]" *Document No. 11, p. 9.* The Court notes that a debtor-in-possession, for legal purposes, is imbued with rights, powers and duties that are very similar to those of a trustee. 11 U.S.C. § 1107. Even though the traditional Chapter 11 case involves a business reorganization rather than a liquidation, it is clear that IT Group's bankruptcy was a liquidation. In the Chapter 11 context, bankruptcy trustees rarely exist, and the

_____

[14]The First Amended Complaint states: "The Trust brings this action in its capacity as the representative of the Debtors and their estates and for the benefit of the estates' creditors." *Document No. 1, Ex. E, at ¶ 2.* The Court acknowledges that if the word "Debtors" were construed to mean the prepetition IT Group, and the words "on behalf of" were construed to mean "as the representative of," the language of the First Amended Complaint would mean that the Trust Action is brought "on behalf of" IT Group even if the estate of IT Group, the debtor-in-possession, is treated as a different entity. Under this interpretation, the Trust Action would be brought "on behalf of" both the debtor and the debtor-in-possession. Nevertheless, Federal and Continental do not dispute the fact that the debtor-in-possession, rather than the prepetition debtor, assigned the claims to the Trust. The Court does not place dispositive weight on the semantics of the First Amended Complaint, since placing too much reliance on the pleadings would provide counsel with an opportunity for gamesmanship.

appointment of a trustee is viewed as an extraordinary remedy. *The Official Committee of Unsecured Creditors of Cybergenics Corporation v. Chinery*, 330 F.3d 548, 560 (3d Cir. 2003).

In support of its position that the claims were assigned to the Trust by an **Insured**, Federal relies on the U.S. Supreme Court's decision in *National Labor Relations Board v. Bildisco & Bildisco*, 465 U.S. 513 (1984), in which the Court stated:

> The second issue raised by this case is whether the NLRB can find a debtor-in-possession guilty of an unfair labor practice for unilaterally rejecting or modifying a collective-bargaining agreement before formal rejection by the Bankruptcy Court. Much effort has been expended by the parties on the question of whether the debtor is more properly characterized as an "alter ego" or a "successor employer" of the prebankruptcy debtor, as those terms have been used in our labor decisions. We see no profit in an exhaustive effort to identify which, if either, of these terms represents the closest analogy to the debtor-in-possession. Obviously if the latter were a wholly "new entity," it would be unnecessary for the Bankruptcy Code to allow it to reject executory contracts, since it would not be bound by such contracts in the first place. For our purposes, it is sensible to view the debtor-in-possession as the same "entity" which existed before the filing of the bankruptcy petition, but empowered by virtue of the Bankruptcy Code to deal with its contracts and property in a manner it could not have done absent the bankruptcy filing.

*Bildisco*, 465 U.S. at 527-528. Federal contends that, for the purpose of the instant case, the debtor-in-possession is the same entity as IT Group. *Document No. 111, p. 10.* The Supreme Court's discussion, however, did not deal with the issue presented in this case. The Court saw no need to make a clear distinction between the prebankruptcy debtor and the debtor-in-possession for the purpose of the precise question presented for resolution in *Bildisco*.

The principle that the Supreme Court's language in *Bildisco* is limited to the facts of that case has been recognized in subsequent decisions issued by federal courts. For instance, in *Cigna Insurance Company v. Gulf USA Corporation*, 1997 U.S. Dist. LEXIS 23816 (D.Idaho 1997), the U.S. District Court for the District of Idaho stated the following:

> Unlike the Insurers, the Court does not read *Bildisco* as foreclosing a determination that a debtor-in-possession is legally distinct from the pre-bankruptcy corporation. The language from *Bildisco* upon which the Insurers rely–that 'it is sensible to view the debtor-in-possession as the same entity which existed before the filing of the bankruptcy petition–is expressly limited to the facts of that case. While the Supreme Court made clear that a debtor-in-possession

17

cannot be considered a 'wholly new entity,' it also made clear that the nature of
the pre-petition entity may be altered by operation of the Bankruptcy Code.
Consequently, Ninth Circuit cases decided after *Bildisco* have often characterized
a debtor-in-possession as an entity that is legally distinct from its pre-petition
form.

*Cigna Insurance Company*, 1997 U.S. Dist. LEXIS 23816, at 11-12.[15]  *Cigna Insurance

Company* involved a factual scenario similar to that presented in the instant case.  The District

Court held that the claims were not barred by the relevant "insured v. insured" exclusion.  *Cigna

Insurance Company*, 1997 U.S. Dist. LEXIS 23816, at 16-17 ("Under the Bankruptcy Code and

the confirmed Chapter 11 plan, Gulf as debtor-in possession is asserting claims on behalf of and

for the benefit of Gulf's shareholders and creditors.  In this respect, the claims are not made 'by,'

or 'on behalf,' or by 'successors' to Gulf.  Instead, the asserted claims are of the same type that

could have been made pre-petition by the corporation's shareholders.").

The Individual Defendants place a significant amount of reliance on the decision of the

U.S. District Court for the District of Delaware in *Alstrin v. St. Paul Casualty Company*, 179

F.Supp.2d 376 (D.Del. 2002).  In *Alstrin*, the District Court addressed a set of facts that was

analogous to that presented in this case.  The District Court explained:

> The court agrees with the D&O plaintiffs and the Estate Representative that the
> "insured v. insured" exclusion should not apply to claims brought by a bankruptcy
> Estate Representative against the former directors and officers of the Debtor
> where the Debtor is the insured entity, because the Debtor's Estate Representative
> (the RAG Estate) and the Debtor (RAG) are separate entities.

*Alstrin*, 179 F.Supp.2d at 404.  The District Court, however, based its decision primarily upon

the absence of collusion and the fact that the estate representative was "acting as a genuinely

---

[15]See, e.g., *Bonner Mall Partnership v. U.S. Bancorp Mortgage Co. (In re Bonner Mall
Partnership)*, 2 F.3d 899, 915 (9th Cir. 1993)(explaining that "bankruptcy law is very formalistic
in that it treats the debtor, the debtor-in-possession, and old equity as legally distinct entities"),
mot. to vacate judgment denied; case dismissed as moot, 513 U.S. 18, 115 S.Ct. 386, 130
L.Ed.2d 233 (1994); *Hills Motors, Inc. v. Hawaii Auto. Dealers' Ass'n*, 997 F.2d 581, 585, n. 6
(9th Cir. 1993)(explaining that, in the majority of Chapter 11 cases, the debtor's management
maintains operation of the business and that in "such cases the debtor is known as debtor in
possession, which is a legally distinct entity").

adverse party to the Debtor's former directors and officers." *Id.* at 404. As Federal correctly points out, the application of the IVI Exclusion is not limited to those instances in which collusion is present. *Document No. 83, p. 12.* Where the IVI Exclusion applies, an absence of collusion is of no legal significance.

In other contexts, courts have recognized a distinction between a prebankruptcy debtor and a debtor-in-possession. The U.S. Court of Appeals for the Third Circuit has recognized that, "in the context of the assumption and assignment of executory contracts, a solvent contractor and an insolvent debtor in possession going through bankruptcy are materially distinct entities." *In the Matter of West Electronics, Inc.*, 852 F.2d 79, 83 (3d Cir. 1988). Other courts have recognized that a prepetition debtor and a debtor-in-possession are legally distinct entities. *H.K. Porter Company, Inc. v. Delta Star, Inc. (In Re H.K. Porter Company, Inc.)*, 183 B.R. 96, 102 (Bankr.W.D.Pa. 1995)("A Chapter 11 debtor in possession has all the rights and powers of a trustee."); *Chestnut Ridge Plaza Associates v. Fox Grocery Company (In Re: Chestnut Ridge Plaza Associates, L.P.)*, 156 B.R. 477, 483, n. 5 (Bankr.W.D.Pa. 1993)("[A] debtor-in-possession is a different entity from the debtor."); *Second Pennsylvania Real Estate Corporation v. Papercraft Corporation (In Re: Papercraft Corporation)*, 126 B.R. 926, 931 (Bankr.W.D.Pa. 1991)("The Court of Appeals for the Third Circuit recognizes that a debtor-in-possession is 'a new entity, separate and apart from the prebankruptcy company . . .").[16] The U.S. Court of Appeals for the Sixth Circuit elaborated on this point in *Gordon Sel-Way, Inc. v. United States of America (In Re: Gordon Sel-Way, Inc.)*, 270 F.3d 280 (6th Cir. 2001):

> In Chapter 11 bankruptcy, the debtor files a petition for bankruptcy, becomes a debtor-in-possession, and thus succeeds to a set of statutorily defined powers and duties. The debtor-in-possession is considered to be a separate legal entity from the debtor himself. Since the debtor and the debtor-in-possession are separate legal persons, there is no mutuality between a creditor's pre-petition claim against a debtor and a debtor-in-possession's post-petition claim against a creditor.

---

[16]The U.S. Court of Appeals for the Ninth Circuit has recently taken the position that, in the Chapter 11 context, the debtor and the debtor-in-possession are *not* to be treated as separate legal entities. *DiSalvo v. DiSalvo (In Re Salvatore W. DiSalvo)*, 219 F.3d 1035, 1038 (9th Cir. 2000).

19

*Gordon Sel-Way, Inc.*, 270 F.3d at 290.  Obviously, if the entity that assigned the claims to the Trust was not an **Insured** under the Federal Policy, coverage for the Trust Action is not precluded by the IVI Exclusion.

Since the debtor-in-possession is clearly not the same entity as the prepetition IT Group, the Trust Action is not "brought or maintained by or on behalf of any **Insured**[.]"  As noted earlier, the term "**Insured**" includes both **Insured Organizations** and **Insured Persons**, the former of which is defined in the Federal Policy as "those organizations designated in Item 5 of the Declarations for this coverage section."  *Document No. 125 at ¶ 16.*  Item 5 identifies only "The IT Group, Inc. and Its Subsidiaries."  *Id.*  It is obvious that the debtor-in-possession, which assigned the claims to the Trust, is not a subsidiary of IT Group.  Given the Court's determination that the debtor-in-possession is a separate and distinct entity from the prepetition IT Group, the debtor-in-possession does not fall within the definition of the term "**Insured**."  Accordingly, it is apparent that coverage for the Trust Action is not precluded by the IVI Exclusion.

Federal's argument is not helped by the decision of the Pennsylvania Commonwealth Court in *TIG Specialty Insurance Company v. Koken*, 855 A.2d 900 (Pa.Commw. 2004).  Federal relies on *TIG* for the general proposition that "the exclusions and defenses which apply to an insolvent company's action against its directors and officers are equally applicable when the action is being brought or maintained by entities such as unsecured creditors committees, bankruptcy receivers and/or statutory liquidators."  *Id.*  The problem with Federal's argument is that it ignores a critical difference between the language in the Federal Policy at issue in this case and the language of the policy construed in *TIG*.  The exclusion at issue in *TIG* made it clear that coverage did not extend to any claim made against an insured arising out of the following:

I.      Any Claim brought by, on behalf of or at the behest of the Company, its successor, its assignee, its trustee in bankruptcy, its debtor-in-possession, or its litigation trustee . . .  However, this exclusion shall not apply to:

***

2)      derivative suits brought or maintained on behalf of the Company by one or more persons who are not Insureds and who bring and maintain the Claim without solicitation, assistance or active participation of the Company or any Insured . . .

*TIG*, 855 A.2d at 907.[17]  The Commonwealth Court construed the word "successor" to mean "any entity that replaces the company and stands in its shoes, whether voluntary ('assignee') or involuntary ('trustee in bankruptcy')."  *Id.* at 914.  Unlike the contractual language at issue in *TIG*, the Federal Policy at issue in this case does not use the terms "successor," "assignee," "trustee in bankruptcy," "debtor-in-possession," or "litigation trustee."  Instead, the IVI Exclusion presently before the Court extends only to claims "brought or maintained by or on behalf of any **Insured**[.]"  Under this circumstance, it is difficult to fathom how Federal believes that the Commonwealth Court's decision in *TIG* helps Federal's case more than it hurts it.  If anything, the exclusion construed in *TIG* illustrates how an exclusion intended to preclude coverage under the present circumstances might read.  Assuming the unavailability of the derivative exception, it is clear that coverage for the Trust Action would be precluded by the IVI Exclusion if the Federal Policy contained the same language as the policy at issue in *TIG*.[18]

If Federal wanted to preclude coverage under the circumstances of this case, it could have opted for any of three alternatives.  First, it could have drafted the IVI Exclusion in a similar

_____

[17]The language of the policy construed in *TIG* indicates that the drafter treated a debtor-in-possession as a distinct entity from the prepetition debtor.  This can be inferred from the fact that the terms "successor," "assignee," "trustee in bankruptcy," and "litigation trustee" clearly refer to entities other than the debtor.  By including the term "debtor-in-possession" in this list, the drafter obviously viewed it as a separate entity from the debtor.  There is no dispute that a bankruptcy trustee is a distinct entity from the prepetition debtor.  *Cohen v. National Union Fire Insurance Company of Pittsburgh, PA*, 280 B.R. 319, 328 (Bankr.S.D.N.Y. 2002).  It is, of course, true that the interpretation of one insurance policy does not control the interpretation of another, since different parties are free to draft their own contracts according to their own terms.  Nevertheless, the language of the policy at issue in *TIG* strongly suggests that the debtor-in-possession is often viewed as separate and distinct from the prepetition debtor in the context of insurance policies.

[18]Federal also relies on *Official Committee of Unsecured Creditors v. R.F. Lafferty & Co., Inc.*, 267 F.3d 340 (3d Cir. 2001), for the proposition that a creditors' committee stands in the shoes of the debtor.  *Document No. 111, p. 6.*  *Official Committee of Unsecured Creditors*, however, dealt with the affirmative defense of *in pari delicto*, which prevents a plaintiff from asserting a claim against a defendant if the plaintiff bears fault for the claim.  *Official Committee of Unsecured Creditors*, 267 F.3d at 354.  Since no such defense is raised in this case, *Official Committee of Unsecured Creditors* is inapposite.

manner to the exclusion that was construed in *TIG*.  Second, it could have defined the term **Insured** to include not only IT Group and its subsidiaries, but also IT Group's successor, assignee, trustee in bankruptcy, debtor-in-possession, or litigation trustee.  Finally, Federal could have defined the term "IT Group" to include its successor, assignee, trustee in bankruptcy, debtor-in-possession, or litigation trustee.  Having opted for none of these options, Federal has clearly limited the reach of the IVI Exclusion to a category of cases which is too narrow to encompass the Trust Action.

In concluding that the Trust Action was not commenced "on behalf of" IT Group, the Court does not rest its analysis on a detailed parsing of the language in the pleadings.  Placing extensive reliance on the pleadings themselves would create an opportunity for gamesmanship on the part of counsel.  For this reason, the Court focuses on the real-world, practical relationship between the various entities.  *Pintlar Corporation v. The Fidelity and Casualty Company of New York (In re: Pintlar Corporation)*, 205 B.R. 945, 947-948 (Bankr.D.Idaho 1997).

The Court's conclusion is consistent with *Pintlar Corporation* and *Patrick County Memorial Hospital v. Federal Insurance Company (In re: R.J. Reynolds)*, 315 B.R. 674 (Bankr. W.D.Va. 2003), which have been relied upon heavily by the parties.  In *Pintlar Corporation*, the Bankruptcy Court held that the litigation trustees were "not acting for the benefit of the corporation, but for the benefit of the corporation's creditors, including the shareholders." *Pintlar Corporation*, 205 B.R. at 948.  In *R.J. Reynolds*, the Bankruptcy Court determined that the litigation trust was acting on behalf of the debtor, and that the relevant claims were within the scope of the applicable policy exclusion.  *R.J. Reynolds*, 315 B.R. at 682.  In both cases, however, the primary concern was with ensuring that the claims were not transferred to a trust solely for the purpose of avoiding the exclusion.  *Pintlar Corporation*, 205 B.R. at 947 ("Further, the exclusions cannot be avoided by the process of assigning the claims to another entity merely for the purpose of avoiding the exclusion."); *R.J. Reynolds*, 315 B.R. at 681 ("In a case in which the debtor voluntarily transfers the causes of action to a third party, there is the distinct possibility of collusion between the debtor and the directors and officers.").  In the instant case, it is clear from the evidence of record that Federal accepted the OCUC Action for coverage, and that the IVI Exclusion was not raised as a potential bar to coverage until after the assignment of

22

the claims to the Trust.  *Document No. 88, Exs. 20 & 21.*  Having examined both the Complaint filed by the OCUC and the First Amended Complaint filed by the Trust, the Court notes that the first seven counts in the First Amended Complaint are the same as those which appeared in the original Complaint.  *Document No. 1, Ex. B, ¶¶ 58-108, Ex. E, ¶¶ 58-108.*  The eighth and ninth counts in the First Amended Complaint are largely interrelated with the original seven counts. *Id., Ex. E, ¶¶ 109-118.*  Under these circumstances, it is clear that the claims could have been pursued by the OCUC in the absence of the assignment to the Trust, and that coverage for the claims would not have been barred by the IVI Exclusion.  Accordingly, it cannot be said that the claims were assigned to the Trust solely for the purpose of avoiding the IVI Exclusion.[19]

In concluding that the debtor-in-possession is a different entity than IT Group, the Court notes that the U.S. Bankruptcy Court for the Western District of Pennsylvania has consistently read the Court of Appeals' language in *West Electronics* broadly, thereby taking the position that the debtor-in-possession is a distinct entity from the prepetition debtor.  *H.K. Porter Company, Inc.*, 183 B.R. at 102; *Chestnut Ridge Plaza Associates*, 156 B.R. at 483, n. 5; *Second Pennsylvania Real Estate Corporation*, 126 B.R. at 931.  It is for this reason that the Court construes the term "IT Group," as it appears in the Federal Policy, to include only the prepetition debtor and not the debtor-in-possession.  Our Court of Appeals has clearly rejected a broad reading of the Supreme Court's language in *Bildisco*.  *West Electronics*, 852 F.2d at 83. Therefore, the Court is not persuaded by Federal's argument that *Bildisco* precludes a determination that the debtor-in-possession is a different entity than the prepetition IT Group.

The Court is mindful of the fact that, in the context of a case such as this, the dispositive inquiry centers on the intentions of the contracting parties rather than on the intentions of legislative bodies.  For this reason, it must be acknowledged that the treatment of the debtor and the debtor-in-possession as distinct legal entities has not been universally accepted.  Some courts

---

[19]Federal and Continental have presented evidence of the Individual Defendants' involvement in the decision to assign the claims to the Trust.  Such evidence, however, has been presented for the purpose of establishing that the derivative exception to the IVI Exclusion is inapplicable.  The Court does not reach this issue, given the determination that the IVI Exclusion is not applicable in any event.  It is clear from the record that Federal did not view the OCUC Action as being within the IVI Exclusion.  *Document No. 88, Ex. 20.*

have read *Bildisco* to mean that the prepetition debtor is the same entity as the debtor-in-possession for all purposes.  *In Re: Footstar, Inc.*, 323 B.R. 566, 574, n. 4 (Bankr.S.D.N.Y. 2005)("The Supreme Court has laid to rest the notion that a debtor in possession should be deemed a different entity than the prepetition debtor.").  Other courts have concluded, as the Supreme Court did in *Bildisco*, that the debtor and the debtor-in-possession should be treated as the same entity in certain contexts.  *DiSalvo v. DiSalvo (In re Salvatore W. DiSalvo)*, 219 F.3d 1035, 1038 (9th Cir. 2000)(reading *Bildisco* to be applicable "in the Chapter 11 context" rather than simply in the context of the facts before the Supreme Court); *In Re: Edward G. Leroux, Jr.*, 216 B.R. 459, 469-470 (Bankr.D.Mass. 1997)(holding that an individual debtor-in-possession is the same entity as the prepetition debtor for purposes of *res judicata*).  There are even some courts which have noted that there is no clear answer to the question of whether a debtor-in-possession should generally be viewed as the same entity as the prepetition debtor.  *Bonneville Power Administration v. Mirant Corporation (In the Matter of: Mirant Corporation)*, 440 F.3d 238, 254, n. 21 (5th Cir. 2006)("Accordingly, neither the Supreme Court nor this Circuit has resolved the argument presented by BPA that rights obtained in bankruptcy require that a debtor in possession be treated as a distinct legal entity from a prepetition debtor."); *United States of America v. Gerth*, 991 F.2d 1428, 1435-1436 (8th Cir. 1993)(declining to address the "broad issue" of whether the "different entity theory" remains viable in any context after *Bildisco*); *Biltmore Associates, L.L.C. v. Twin City Fire Insurance Company*, 2006 U.S. LEXIS 56034 (D.Ariz. 2006)("The distinction between a debtor and a debtor in possession is nuanced and unclear, and has yielded varying results in district courts, among the circuits, and within the Ninth Circuit.  The application of this distinction to an Insured v. Insured contract provision is more complex, and has also yielded varying results.").

Although this Court construes the words "IT Group" to include only the prepetition debtor and not the debtor-in-possession, which is consistent with the approach taken by our Bankruptcy Court, it must be acknowledged that the parties to an insurance contract are free to treat the debtor and the debtor-in-possession as the same entity for purposes of their contractual arrangement.  Had Federal defined the term "IT Group" broadly enough to include the debtor-in-possession, the Court would be bound by that definition.  In this context, the Court's function is

to construe a *particular contract* entered into by *particular parties*.  This function is quite different from that of construing a constitutional or statutory provision enacted by a legislative body.  Generally speaking, legislative mandates apply equally to all people, whereas contractual provisions bind only the parties to the contract.  Since the Court is called upon to interpret an insurance contract, the possibility that the parties intended the term "IT Group" to include the debtor-in-possession cannot be dismissed solely on the ground that the prevailing law in this Circuit treats a debtor and a debtor-in-possession as separate entities.  For the purpose of an alternative analysis, the Court may assume *arguendo* that the term "IT Group" could reasonably be construed to include the post-bankruptcy debtor-in-possession.  The Court may also assume, for the purpose of this alternative analysis, that the phrase "on behalf of" could reasonably be construed to mean "as the representative of" rather than "for the benefit of."  Given these *arguendo* assumptions, the Court would still grant summary judgment in favor of the Individual Defendants.  Under Pennsylvania law, ambiguous provisions of an insurance policy must be construed in favor of the insured and against the insurer.  *Minnesota Fire & Casualty Company v. Greenfield*, 855 A.2d 854, 861 (Pa. 2004).  Since the construction proposed by the Individual Defendants is likewise reasonable, the Court would be required to construe the applicable provisions of the Federal Policy in their favor as insureds.

Even if the Court was not convinced that the IVI Exclusion is not applicable to the Trust Action, summary judgment in favor of the Individual Defendants would nevertheless be required under Pennsylvania law.  In *Madison Construction Company v. The Harleysville Mutual Insurance Company*, 735 A.2d 100 (Pa. 1999), the Supreme Court of Pennsylvania explained the law of Pennsylvania as it relates to the construction of insurance contracts:

> The task of interpreting an insurance contract is generally performed by a court rather than by a jury.  The goal of that task is, of course, to ascertain the intent of the parties as manifested by the language of the written instrument.  Where a provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer, the drafter of the agreement.  Where, however, the language of the contract is clear and unambiguous, a court is required to give effect to that language.  Contractual language is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense.  This is not a question to be resolved in a vacuum.  Rather, contractual terms are ambiguous if they are subject to more

> than one reasonable interpretation when applied to a particular set of facts.  We
> will not, however, distort the meaning of the language or resort to a strained
> contrivance in order to find an ambiguity.

*Madison Construction Company*, 735 A.2d at 106 (citations, brackets and internal quotation marks omitted).  "This rule of strict construction against the insurer is especially true should the ambiguity exist as an exception to general liability." *Canal Insurance Company v. Underwriters at Lloyd's London*, 435 F.3d 431, 435 (3d Cir. 2006).  "Where an insurer relies on a policy exclusion as the basis for its denial of coverage and refusal to defend, the insurer has asserted an affirmative defense and, accordingly, bears the burden of proving such defense." *Madison Construction Company*, 735 A.2d at 106.

In determining the proper resolution of the pending motions, the Court is mindful of the fact that "ambiguity (or the lack thereof) is to be determined by reference to a particular set of facts[.]" *Id.* at 107.  Given the fact-specific nature of the inquiry, it is entirely possible that contractural language could be ambiguous as to one set of facts and unambiguous as to another.  For this reason, it would be incumbent upon Federal and Continental to demonstrate that the IVI Exclusion unambiguously bars coverage under the particular circumstances of this case.  It is to this alternative inquiry that the Court now turns.

The language of the policy construed in *TIG*, which specifically listed the terms "successor," "assignee," "trustee in bankruptcy," "debtor-in-possession," and "litigation trustee," provides support for the Court's alternative determination that the language of the Federal Policy is ambiguous.  *TIG*, 855 A.2d at 907.  If Federal wanted its IVI Exclusion to bar coverage for actions "brought or maintained by or on behalf of" a debtor-in-possession, it could have used language such as that used by the drafter of the *TIG* policy.  Federal also could have opted to include the debtor-in-possession within the definition of the term **Insured**, or to define the term "IT Group" to include the debtor-in-possession.  Having chosen none of these options, Federal now claims that the IVI Exclusion unambiguously precludes coverage for the Trust Action.  This argument is unavailing.

The ambiguous nature of the IVI Exclusion is highlighted by the deposition testimony of Todd Sandahl [hereinafter "Sandahl"], an underwriter employed by Chubb & Son, which is a

26

division of Federal. *Document No. 88, p. 4, at ¶ 15.* Sandahl testified that he did not recall discussing the applicability of the IVI Exclusion in the bankruptcy context until sometime in 2003. *Id., Ex. 7, pp. 73-75.* He also testified that he had no opinion as to whether the IVI Exclusion covered claims brought against an insured by a trustee in bankruptcy, and that he did not remember discussing the issue with anyone at Federal or Chubb & Son prior to 2003. *Id., p. 128.* The lack of clarity in the language of the IVI Exclusion with respect to the particular circumstances of this case severely undermines Federal's argument that coverage for the Trust Action is unambiguously excluded.

Assuming *arguendo* that the IVI Exclusion is ambiguous as applied to the facts in this case, the Court must determine the appropriate remedy. The Individual Defendants argue that the Court "may determine that an ambiguity exists and construe the ambiguity in favor of the insured as a matter of law at summary judgment without any evidentiary support other than that obtained thus far by the parties." *Document No. 87, p. 24.* Federal argues to the contrary, pointing out that the Court has already indicated, in two prior orders, that a finding of ambiguity would necessitate the denial of the pending motions for summary judgment and the commencement of an additional period of discovery. *Document Nos. 71 & 79.* These orders were consistent with the decision of the U.S. Court of Appeals for the Third Circuit in *12th Street Gym, Inc. v. General Star Indemnity Company*, 93 F.3d 1158 (3d Cir. 1996). In *12th Street Gym, Inc.*, the Court of Appeals, having found an insurance policy exclusion to be ambiguous, remanded the case to the District Court so that the factfinder could consider extrinsic evidence regarding the exclusion's meaning. *12th Street Gym, Inc.*, 93 F.3d at 1160. It was noted that, under Pennsylvania law, "a court will only construe ambiguous language against the drafter in the absence of relevant extrinsic evidence." *Id.* at 1166. Relying on the decision of the Pennsylvania Supreme Court in *Hutchison v. Sunbeam Coal Corporation*, 519 A.2d 385 (Pa. 1986), the Court of Appeals divided the relevant inquiry into two distinct parts:

> Under Pennsylvania law, a court determines as a matter of law whether there is an ambiguity. If so, the factfinder shall resolve the ambiguity.

*12th Street Gym, Inc.*, 93 F.3d at 1166. *Hutchison*, which was relied upon by the Court of Appeals for the proposition that ambiguous portions of an insurance policy are to be construed by

27

the factfinder, involved an option and lease agreement rather than an insurance policy. *Hutchison*, 519 A.2d at 387.   The Court of Appeals also relied on the Pennsylvania Superior Court's decision in *Peerless Dyeing Company, Inc. v. Industrial Risk Insurers*, 573 A.2d 541 (Pa.Super. 1990), in which the Superior Court stated that "it is the duty of the *court* to interpret an unambiguous provision while interpretation of ambiguous clauses may properly be left to a jury." *Peerless Dyeing*, 573 A.2d at 544 (emphasis in original).   In contrast to *Hutchison*, *Peerless Dyeing* did involve the interpretation of an insurance contract.

In later cases, the Pennsylvania courts began to make clear that "[a] question regarding the interpretation of an insurance contract is a matter of law for the courts to decide." *Weisman v. The Green Tree Insurance Company*, 670 A.2d 160, 161 (Pa.Super. 1996).   In retrospect, the language in cases such as *12ᵗʰ Street Gym, Inc.* and *Peerless Dyeing* appears to have blurred the distinction between the interpretation of *insurance* contracts and the interpretation of other contracts.   In light of more recent precedents, however, it now appears that Pennsylvania law treats insurance policies differently than other contracts.

Two very recent decisions of the Supreme Court of Pennsylvania are illustrative of this point.   *The Insurance Adjustment Bureau, Inc. v. Allstate Insurance Company*, 905 A.2d 462 (Pa. 2006), involved a written agreement between one insurance company and another insurance company's insureds.   *The Insurance Adjustment Bureau, Inc.*, 905 A.2d at 465-466.   The plaintiff insurance company contended that a written agreement between it and another company's insureds entitled it to the payment of insurance proceeds.   *Id.* at 465.   In that context, the Pennsylvania Supreme Court explained:

> The fundamental rule in contract interpretation is to ascertain the intent of the contracting parties.   In cases of a written contract, the intent of the parties is the writing itself.   Under ordinary principles of contract interpretation, the agreement is to be construed against its drafter.   When the terms of a contract are clear and unambiguous, the intent of the parties is to be ascertained from the document itself.   When, however, an ambiguity exists, parol evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is patent, created by the language of the instrument, or latent, created by extrinsic or collateral circumstances.   A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. While unambiguous contracts are interpreted by the court as a matter of law, ambiguous writings are interpreted by the finder of fact.

*Id.* at 468-469 (citations omitted).  The contract at issue in *The Insurance Adjustment Bureau, Inc.* was an assignment contract and not an insurance contract.

The Pennsylvania Supreme Court decided *The Insurance Adjustment Bureau, Inc.* just two days after it decided *Prudential Property and Casualty Insurance Company v. Sartno*, 903 A.2d 1170 (Pa. 2006).  In *Prudential Property*, the Court interpreted an insurance contract.  It was noted at the outset that "[t]he interpretation of an insurance contract regarding the existence or non-existence of coverage is generally performed by the court."  *Prudential Property*, 903 A.2d at 1175 (internal quotation marks omitted).  Moving on to interpret the particular insurance policy at issue in the case, the Court stated the following:

> The instant matter is a prime example of language in a policy that can be understood in more than [one] way.  Sartno prefers one interpretation; Prudential favors the other.  Regardless of which one is "right" or "wrong," the fact is that because each interpretation is reasonable, the exclusionary term is ambiguous, and we must construe it in favor of the insured.  Where a provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer, the drafter of the agreement.  The insurance company is the drafter of the terms of the policies it issues to its insureds, and, being the one who selects the language in the contract, must be specific in its use; an exclusion from liability must be clear and exact in order to be given effect.

*Id.* at 1177 (internal quotation marks and citations omitted).  In the wake of *The Insurance Adjustment Bureau, Inc.* and *Prudential Property*, it appears that Pennsylvania law distinguishes between insurance contracts and other types of contracts.  While the general contract law of Pennsylvania provides that unambiguous writings are construed by the court as a matter of law and ambiguous writings are construed by the finder of fact, the insurance contract law of Pennsylvania provides only for a judicial construction as a matter of law, with all ambiguities to be resolved in favor of the insureds.

In an order dated August 7, 2006, this Court stated that it would allow "an additional period of discovery for the parties to collect their respective parol evidence as to what the parties intended by any provision that is found to be ambiguous by the Court."  *Document No. 79*.  This order, however, was issued two weeks prior to the Pennsylvania Supreme Court's decision in

*Prudential Property.*  In light of that decision, it is now clear that an additional period of discovery would not be necessary even if the language of the Federal Policy did contain an ambiguity.  Any parol evidence as to what the parties intended by the language of the IVI Exclusion would only serve to illustrate, if anything, which proposed construction is right or wrong.  *Prudential Property* makes it clear that an ambiguous exclusion appearing in an insurance contract must be construed in favor of the insured *irrespective of which proposed construction is right or wrong.  Prudential Property*, 903 A.2d at 1177.  Assuming for the purpose of this alternative rationale that the IVI Exclusion is ambiguous as applied to the facts of this case, it is clear that the construction proposed by the Individual Defendants is, at a minimum, reasonable.  Under Pennsylvania law, the inquiry can go no further.  Any language to the contrary in *12th Street Gym, Inc.* is due to the lack of clarity that existed in the law of Pennsylvania ten years ago.  Even before the decisions of the Pennsylvania Supreme Court in *The Adjustment Bureau, Inc.* and *Prudential Property*, our Court of Appeals began to recognize that, under Pennsylvania law, "[w]here a provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer, the drafter of the agreement." *Lexington Insurance Company v. Western Pennsylvania Hospital*, 423 F.3d 318, 323 (3d Cir. 2005).  Accordingly, the Court would be constrained to construe the ambiguous language in the IVI Exclusion in favor of the insured and against the insurer.

In summary, the Court construes the term "IT Group," as it appears under Item 5 of the Federal Policy Declarations, to include only the prepetition debtor.  This construction is consistent with the approach adopted by our Bankruptcy Court in the aftermath of *West Electronics*.  Given this construction, it cannot be said that the Trust Action was "brought or maintained by or *on behalf of*" an **Insured**.  The Trust, as the assignee of the claims, stands in the shoes of the post-bankruptcy debtor-in-possession, which does not qualify as an **Insured** under the Federal Policy.  In the alternative, the Court assumes *arguendo* that the term "IT Group" could reasonably be construed to include the debtor-in-possession, and that the phrase "on behalf of" could reasonably be construed to mean "as the representative of."  Given these assumptions, it cannot be doubted that the term "IT Group" could reasonably be construed to include only the prepetition debtor, and that the phrase "on behalf of" could reasonably be construed to mean "for

the benefit of."  Since Pennsylvania law requires ambiguous insurance policy provisions to be construed in favor of the insured and against the insurer, the Court must adopt the construction favorable to the Individual Defendants.  It is clear that the Trust Action was commenced for the benefit of the creditors.  Accordingly, summary judgment must be entered in favor of the Individual Defendants.

B.      The "Uninsurable Loss" Issue

Continental moves for summary judgment with respect to coverage for Counts VI and VIII of the First Amended Complaint.  *Document No. 155, pp. 3-8.*  Count VI states a claim for avoidance and recovery of transfers made to Gibson, Harvey, Pogue, Pugliese, Schmidt, Watkins and the Carlyle Defendants pursuant to §§ 547 and 550 of the Bankruptcy Code.  *Document No. 1, Ex. E, ¶¶ 80-96.*  Count VIII states a claim for fraudulent conveyances made to the preference defendants and the Carlyle Defendants under §§ 544, 550 and 551 of the Bankruptcy Code and 6 Delaware Code § 1303.  *Id., ¶¶ 109-115.*  Continental contends that these counts state claims which are uninsurable as a matter of law.  The thrust of Continental's position is that the damages sought in Counts VI and VIII do not constitute insurable "losses" within the language of the Federal Policy.

The Individual Defendants argue that restitutionary claims are uninsurable as a matter of law only if the insured's culpability in the underlying action is either proven or admitted.  *Document No. 133, p. 6.*  They contend that Continental's argument is simply an attempt to use a vague "public policy" theory in order to avoid the applicable requirements of the Personal Profit Exclusion.  *Document No. 133, p. 16.*  The Personal Profit Exclusion, in pertinent part, provides:

6.      The Company shall not be liable under Insuring Clause 1 for **Loss** on account of any **Claim** made against any **Insured Person**:

***

(c)      based upon, arising from, or in consequence of such **Insured Person** having gained in fact any personal profit, remuneration or advantage to which such **Insured Person** was not legally entitled.

Document No. 1, Ex. A.  The question of whether Counts VI and VIII state claims constituting insurable losses under the Federal Policy is, of course, distinct from the question of whether they

31

are within the Personal Profit Exclusion.  Nevertheless, the inquiry as to the insurable loss issue

overlaps significantly with that as to the Personal Profit Exclusion.

In support of its Motion for Partial Summary Judgment, which seeks summary judgment

on the insurable loss issue but not with respect to the Personal Profit Exclusion, Continental

relies upon the Pennsylvania Supreme Court's decision in *Central Dauphin School District v.*

*American Casualty Company*, 426 A.2d 94 (Pa. 1981).[20]  In *Central Dauphin*, the Pennsylvania

Supreme Court construed an insurance policy which stated that the term "Loss" did not include

"matters which shall be deemed uninsurable under the law pursuant to which this policy shall be

construed."  *Central Dauphin*, 426 A.2d at 256.  The Court stated the following:

> Because this Commonwealth's public policy does not permit a school district to
> make unlawful taxation just as revenue-productive as lawful taxation, it must be
> concluded that a political subdivision's return of tax monies to its taxpayers
> collected by an unlawful tax is uninsurable.  Hence there has been no "loss"
> within the meaning of the insurance policy and no claim lies against appellant.

*Id.* at 260.  The situation in *Central Dauphin*, though analogous to the present circumstances (at

least as alleged) in some respects, was very different in others.  The instant case does not involve

governmental entities or political subdivisions, and the unique interests at stake in *Central*

*Dauphin* are simply not implicated here.  If Continental wishes to prevail on a generic "public

policy" ground, as opposed to the more specific ground available under the Personal Profit

Exclusion, it must demonstrate a coherent legal basis for concluding that the law of Pennsylvania

precludes coverage for Counts VI and VIII.  *Central Dauphin* simply does not provide such a

basis.  As the Pennsylvania Supreme Court noted in that case, "[t]axation is a governmental

function controlled by constitutional provisions and statutory direction."  *Id.* at 260.  The same

cannot be said about the circumstances in the instant case.  Consequently, Continental's reliance

---

[20]Count VIII of the First Amended Complaint is based, in part, on Delaware law.
*Document No. 1, Ex. E, ¶¶ 109-115.*  The substantive issue, which is currently being litigated in
the U.S. District Court for the District of Delaware, is governed by Delaware law.  Nevertheless,
the parties in the instant case are in agreement that Pennsylvania law governs the construction of
the Federal Policy.  For this reason, even though the substantive legal issue arises under
Delaware law, the question of whether it is uninsurable as a matter of law, within the meaning of
the Federal Policy, is a question of Pennsylvania law.

on *Central Dauphin*, without more, cannot demonstrate that Counts VI and VIII constitute "matters uninsurable under the law applicable to this coverage."

Since there is no decision of the Pennsylvania Supreme Court which directly addresses the issue presented in this case, this Court must attempt to ascertain how the Pennsylvania Supreme Court would decide this issue. *Wichita Royalty Co. v. City Nat'l Bank of Wichita Falls*, 306 U.S. 103 (1939); *Canal Insurance Company*, 435 F.3d at 436. Since its decision in *Central Dauphin*, the Pennsylvania Supreme Court has consistently limited the scope of the "public policy" rationale for uninsurability. In *Hall v. Amica Mutual Insurance Company*, 648 A.2d 755 (Pa. 1994), the Court made it clear that an alleged public policy may be the basis of a judicial decision only in the "clearest cases." *Hall*, 648 A.2d at 761. Quoting from its prior decision in *Mamlin v. Genoe*, 17 A.2d 407, 409 (Pa. 1941), the Court explained:

> It is only when a given policy is so obviously for or against the public health, safety, morals or welfare that there is a virtual unanimity of opinion in regard to it, that a court may constitute itself the voice of the community in so declaring. There must be a positive, well-defined, universal public sentiment, deeply integrated in the customs and beliefs of the people and in their conviction of what is just and right and in the interests of the public weal. . . . Only in the clearest cases, therefore, may a court make an alleged public policy the basis of judicial decision.

*Hall*, 648 A.2d at 348. Consequently, it is clear that *Central Dauphin* must be read narrowly.

The Pennsylvania Supreme Court limited the reach of *Central Dauphin* again in *Blast Intermediate Unit 17 v. CNA Insurance Companies*, 674 A.2d 687 (Pa. 1996). In that case, the Court was called upon to determine "whether the public policy of the Commonwealth relieves an insurance carrier from its obligation to indemnify the insured for losses incurred as the result of the insured's negligent but good faith violation of a federal statute." *Blast Intermediate Unit 17*, 674 A.2d at 687. The Court noted that it would "not lightly invalidate a contract when an assertion is made that the contract violates public policy." *Id.* at 689. Adhering to a narrow reading of *Central Dauphin*, the Court held that the insurance carrier was not relieved of its contractual obligations pursuant to a generalized "public policy" theory. *Id.* at 691.

The Pennsylvania Supreme Court, in *Blast Intermediate Unit 17*, placed significant reliance on the fact that the insured would not receive a windfall upon indemnification by the

33

insurance company for the financial consequences of the statutory violation. *Id.* It was noted that allowing the insured "to collect under its insurance policy [would] not encourage others to intentionally engage in unlawful activity with the purpose of reaping a benefit from such activity through its insurance." *Id.* In the instant case, it is clear that Federal and Continental have a safeguard to prevent the Individual Defendants from receiving a windfall for wrongfully obtaining money to which they were not legally entitled. The Personal Profit Exclusion, which is not the subject of the present motions for summary judgment but is nevertheless reserved by Federal and Continental, expressly states that the insurers are not liable for any losses "based upon, arising from, or in consequence of such **Insured Person** having gained in fact any personal profit, remuneration or advantage to which such **Insured Person** was not legally entitled." *Document No. 1, Ex. A.* This Court recognizes the fact that the question of whether a "**Loss**" exists in the first place is distinct from the question of whether Federal and Continental are liable for that "**Loss**," and that the exclusion cannot be construed to create coverage where none would otherwise exist. In any event, however, the possibility (or impossibility) of a windfall is itself a factor under Pennsylvania law to be considered as a part of the broader inquiry. Since the Personal Profit Exclusion will effectively prevent the Individual Defendants from receiving a windfall, any policy-related arguments to the effect that Counts VI and VIII state claims for matters uninsurable under Pennsylvania law are significantly weakened. Given the fact that the Pennsylvania Supreme Court has consistently limited the holding in *Central Dauphin* to its facts, this Court cannot conclude that the public policy of Pennsylvania precludes coverage for the claims stated in Counts VI and VIII of the First Amended Complaint.

Continental's argument is not helped by *Level 3 Communications, Inc. v. Federal Insurance Company*, 272 F.3d 908 (7th Cir. 2001). In *Level 3*, the U.S. Court of Appeals for the Seventh Circuit determined that "a 'loss' within the meaning of an insurance contract does not include the restoration of an ill-gotten gain[.]" *Level 3*, 272 F.3d at 910. The theory relied upon by the Court of Appeals was that "[a]n insured incurs no loss within the meaning of the insurance contract by being compelled to return property that it had stolen, even if a more polite word than 'stolen' is used to characterize the claim for the property's return." *Id.* at 911. Nonetheless, the Court of Appeals went on to explain:

34

> We can imagine situations in which there would be a covered loss; this is important as showing that the D&O policy would not be rendered illusory by the acceptance of Federal's interpretation.  An example would be a fraudulent statement by a corporate officer that inflated the price of the corporation's stock without conferring any measurable benefit on the corporation.  Or suppose that unbeknownst to Level 3 the officer had stolen property for its benefit and, not knowing this, Level 3 defended against a suit seeking the return of the property and incurred heavy legal expenses in that defense.  Those expenses would be a loss to the company not offset by any benefit to it, unlike the 'expense' that consists simply of the value of the stolen property, a wash.

*Id.* at 911.  In the instant case, it is far from clear that the Individual Defendants have suffered no "**Loss**" with respect to Counts VI and VIII.[21]

The Individual Defendants buttress their argument by calling the Court's attention to 11 U.S.C. § 547.[22]  That provision, in pertinent part, provides:

(c)   The trustee may not avoid under this section a transfer–

\*\*\*

(2)   to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was–

(A)   made in the ordinary course of business or financial affairs of the debtor and the transferee; or

---

[21]The Individual Defendants apparently believe that the "public policy" issue raised by Continental should be analyzed in accordance with the District Court's analysis of an express exclusion in *Alstrin.  Document No. 133, p. 16.*  In *Alstrin*, the District Court construed an exclusion that was similar to the Personal Profit Exclusion found in the Federal Policy.  *Alstrin*, 179 F.Supp.2d at 398-401.  In this case, however, the Personal Profit Exclusion is not the subject of a motion for summary judgment.  Instead, Continental has raised a more generalized "public policy" argument, contending that Counts VI and VIII in the Trust Action do not state claims amounting to an insurable loss.  *Document No. 155, p. 6.*  It should suffice to say, at this juncture, that the "public policy" of Pennsylvania does not preclude coverage for Counts VI and VIII.  There is no need, at this stage, for the Court to determine whether any proof of culpability is required in order to bring Counts VI and VIII within the Personal Profit Exclusion.

[22]The Court notes that, under 11 U.S.C. § 1107(a), the rights, powers and duties of the debtor-in-possession are essentially the same as those of a trustee.

(B)      made according to ordinary business terms[.]

11 U.S.C. § 547(c)(2)(A)-(B).  The Individual Defendants contend that Counts VI and VIII fall squarely within this statutory safe harbor, and that the "public policy" of Pennsylvania cannot be invoked to deny coverage "until such time as the safe harbor is ruled unavailable and proof of culpability is presented."  *Document No. 133, p. 18.*  The Court is in agreement with the Individual Defendants insofar as their arguments are based on the principle that Continental has not demonstrated a lack of an insurable loss with respect to Counts VI and VIII, particularly in light of the narrow reading of *Central Dauphin* by the Pennsylvania Supreme Court in *Hall* and *Blast Intermediate Unit 17*.  Counts VI and VIII do not constitute "matters uninsurable under the law applicable to this coverage."  Federal and Continental, of course, remain free to assert their defenses under the Personal Profit Exclusion, which involves the interpretation of specific contractual language rather than the incorporation of Pennsylvania law existing independent of the Federal Policy.

Conclusion

Accordingly, the Court must deny Federal's Motion for Partial Summary Judgment *(Document No. 81)* and Continental's Motion for Summary Judgment *(Document No. 98).*  The Individual Defendants' Motion for Partial Summary Judgment *(Document No. 86)* must be granted in its entirety.[23]  Consequently, summary judgment must be granted in favor of the Individual Defendants with respect to Count I in the Complaint filed by Federal and Count I in the Complaint in Intervention filed by Continental.  Summary judgment must be granted in favor of the Individual Defendants with respect to Count VI in the Individual Defendants' counterclaim against Federal and Count III in the Individual Defendants' counterclaim against Continental, but only insofar as these counts are based on the IVI Exclusion.  DeLuca's Motion for Partial Summary Judgment *(Document No. 102)* must be granted, but only with respect to Count VI of

---

[23]The Court construes the Individual Defendants' Motion for Partial Summary Judgment *(Document No. 86)* as seeking summary judgment only with respect to the IVI Exclusion. Summary judgment with respect to Count VI in the Individual Defendants' counterclaim against Federal and Count III in their counterclaim against Continental is granted only insofar as these counts are based on the IVI Exclusion.

his counterclaim against Federal and Count III of his counterclaim against Continental, and only insofar as these counts are based on the IVI Exclusion. Soose's Motion for Summary Judgment *(Document No. 85)* must be granted, but only with respect to the IVI Exclusion. To the extent that DeLuca and Soose intended to move for summary judgment on grounds other than those which were briefed by the parties and adjudicated in this Memorandum Opinion, those issues have been waived for purposes of summary judgment. An appropriate Order follows.


McVerry, J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **FEDERAL INSURANCE COMPANY, an Indiana Corporation,** ) | |
|        **Plaintiff,** ) | |
|   **v.** ) | |
| ) | |
| **CONTINENTAL CASUALTY COMPANY,** ) | |
|       **Intervenor Plaintiff,** ) | |
|   **v.** ) | |
| ) | **2:05-cv-305** |
| **DANIEL A. D'ANIELLO, ANTHONY J. DeLUCA, PHILIP B. DOLAN, E. MARTIN GIBSON, FRANCIS J. HARVEY, JAMES C. MCGILL, RICHARD W. POGUE, ROBERT F. PUGLIESE, CHARLES W. SCHMIDT, HARRY J. SOOSE, and JAMES DAVID WATKINS,** ) | |
|       **Defendants.** ) | |

## ORDER OF COURT

AND NOW, this 22nd day of November, 2006, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED and DECREED** as follows:

- the Motion for Partial Summary Judgment *(Document No. 81)* of Plaintiff, Federal Insurance Company, is **DENIED;**

- to the extent that it is based on the IVI Exclusion of the Federal Policy, the Motion for Summary Judgment *(Document No. 85)* of Defendant, Harry J. Soose, is **GRANTED**;

- to the extent that it is based on the IVI Exclusion of the Federal Policy, the Motion for Partial Summary Judgment *(Document No. 86)* of Defendants Daniel A. D'Aniello, Philip B. Dolan, E. Martin Gibson, Francis J. Harvey, James C. McGill, Richard W. Pogue, Robert F. Pugliese, Charles W. Schmidt and James David Watkins, is **GRANTED**;

- the Motion for Summary Judgment *(Document No. 98)* of Plaintiff, Continental Casualty Company, is **DENIED;** and,
- to the extent that it is based on the IVI Exclusion of the Federal Policy, the Motion for Partial Summary Judgment *(Document No. 102)* of Defendant Anthony J. DeLuca, is **GRANTED**.

BY THE COURT:


s/  Terrence F. McVerry
United States District Court Judge

cc:    Karen Y. Bonvalot, Esquire
        Email: kbonvalot@klettrooney.com

CONTINENTAL CASUALTY COMPANY, Intervenor Plaintiff
        Gabriela Richeimer, Esquire
        Email: gricheimer@rdblaw.com
        Leslie S. Ahari, Esquire
        Email: lahari@rdblaw.com
        Pamela L. Wahl, Esquire
        Email: pwahl@rdblaw.com
        Thomas V. Gebler, Jr., Esquire
        Email: tgebler@margolisedelstein.com
        Jordan Rubinstein, Esquire
        Email: jrubinstein@rdblaw.com

DANIEL A. D'ANIELLO
PHILIP B. DOLAN
E. MARTIN GIBSON
FRANCIS J. HARVEY
JAMES C. McGILL
RICHARD W. POGUE
ROBERT F. PUGLIESE
CHARLES W. SCHMIDT
JAMES DAVID WATKINS
        Ethan J. Brown, Esquire
        Email: ethan.brown@lw.com
        Kelly F. Farmer, Esquire
        Email: Kelly.Farmer@lw.com
        Peter K. Rosen, Esquire
        Email: peter.rosen@lw.com
        Larry K. Elliott, Esquire
        Email: lelliott@cohenlaw.com

ANTHONY J. DeLUCA
        David J. Strasser, Esquire
        Email: dstrasser@eckertseamans.com
        Larry K. Elliott, Esquire
        Email: lelliott@cohenlaw.com

HARRY J. SOOSE
        Charles A. De Monaco, Esquire
        Email: cdemonaco@dmclaw.com
        Frederick W. Thieman, Esquire
        Email: fwt@thiemanward.com